## THOMPSON v. FAIRBANKS.

ERROR TO THE SUPREME COURT OF THE STATE OF VERMONT.

No. 114. Submitted January 6, 1905.—Decided February 20, 1905.

Whether, and to what extent, a chattel mortgage, which includes after acquired property, is valid is a local and not a Federal question, and in such a case this court will follow the decisions of the state court.

The enforcement of a lien by the mortgagee taking possession, with the consent of the mortgagor, of after acquired property covered by a valid mortgage made and recorded prior to the passage of the act, is not a conveyance or transfer under the bankrupt act; and, where it does not appear that it was done to hinder, delay or defraud creditors, it does not constitute a preference under the act although at the time of the enforcement the mortgagee may have known that the mortgagor was insolvent and considering going into bankruptcy and the petition was filed within four months thereafter.

THE plaintiff in error, by this writ, seeks to review a judgment of the Supreme Court of the State of Vermont in favor of the defendant in error. 75 Vermont, 361. The facts upon

which the judgment rests are as follows: On the thirtieth
day of June, 1900, Herbert E. Moore, of St. Johnsbury, in the
State of Vermont, filed his voluntary petition in bankruptcy
in the United States District Court for the District of Ver-
mont, and on the third day of July, 1900, Moore was by the
court duly adjudged a bankrupt, and on the fifteenth of
September, 1900, the plaintiff in error was appointed a trustee
in bankruptcy of Moore's estate, and duly qualified. He
commenced this action in the County Court of Caledonia
County, in the State of Vermont, on the first Tuesday of June,
1901, against the defendant Fairbanks, to recover from him
the value of certain personal property alleged to have be-
longed to the bankrupt Moore on the sixteenth day of May,
1900, and which was, as alleged, sold and converted by Fair-
banks, on that day, to his own use, the value of the property
being $1,500, as averred in the declaration. The defendant
filed his plea and gave notice that upon the trial of the case he
would give in evidence and rely upon, in defense of the action,
certain special matters set up in the plea. The case was, by
order of the County Court, and by the consent of the parties,
referred to a referee to hear the cause and report to the court.
It was subsequently heard before the referee, who filed his
report, finding the facts upon which the decision of the case
must rest. He found that before June, 1886, the bankrupt
Moore bought a livery stock and business in St. Johnsbury
village, in the State of Vermont. At the time of this pur-
chase the defendant was the lessor of the buildings in which
the business was conducted, and it continued to be carried
on in those buildings. Moore, in making the purchase, had
assumed a mortgage then outstanding on the property, and a
short time before March 1, 1888, the defendant assisted him
to pay this mortgage by signing a note with him for $1,425,
payable to the Passumpsic Savings Bank of St. Johnsbury.
Subsequently defendant signed notes, which, with accrued
interest, were merged in one dated March 1, 1900, for $2,510.75,
due on demand to said savings bank signed by the bankrupt

and by the defendant as his surety. This note had not been paid when the case was referred to the referee. The defendant also signed other notes payable to the First National Bank of St. Johnsbury, which were merged into one, and by various payments made by Moore, it was reduced to $525, and on June 4, 1900, it was paid by the defendant. All these notes had been signed by the defendant to assist Moore in carrying on, building up and equipping his livery stable and livery business, and as between them the notes belonged to Moore to pay. On April 15, 1891, Moore gave the defendant a chattel mortgage on the livery property to secure him for these and other debts and liabilities. The property was described in the mortgage as follows: "All my livery property, consisting of horses, wagons, sleighs, vehicles, harnesses, robes, blankets, etc., also all horses and other livery property that I may purchase in my business or acquire by exchange."

The condition contained in the mortgage was, that if Moore should "well and truly pay, or cause to be paid, to the said Henry Fairbanks all that I now owe him, or may owe him hereafter by note, book account, or in any other manner, and shall well and truly save the said Henry Fairbanks harmless, and indemnify him from paying any commercial paper on which he has become or may hereafter become holden in any manner for my benefit as surety, indorser or otherwise, then this deed shall be void, otherwise of force."

This mortgage was acknowledged and the affidavit as provided by the Vermont statute was appended, showing the justice of the debt and the liability contemplated to be secured by the mortgage, and the mortgage was duly recorded on the eighteenth day of April, 1891, in the St. Johnsbury clerk's office by the town clerk thereof. On March 5, 1900, Moore gave the defendant another chattel mortgage on this livery stock, which, on March 23, 1900, defendant assigned to the Passumpsic Savings Bank, and that bank has ever since been its holder and owner. This mortgage was given to secure defendant against all his liabilities for Moore.

On the seventh of May, 1900, one John Ryan sued out a writ in assumpsit against Moore to recover some $500, and an attachment on the livery stock was levied in that suit by the deputy sheriff. This attachment remained in force until dissolved by the bankruptcy proceedings, and the suit is still pending in the state court of Vermont.

Under the agreement contained in the chattel mortgage of April, 1891, Moore made sales, purchases and exchanges of livery stock to such an extent that on March 5, 1900, there only remained of the livery property on hand April 15, 1891, two horses. These sales, exchanges and purchases were sometimes made by Moore without communication with or advice from the defendant, and frequently after consultation with him. The livery stock, as it existed on May 16, 1900, was all acquired by exchange of the original stock or with the avails of the old stock or from the money derived from the business. Some years after the execution of the chattel mortgage of April 15, 1891, Moore became embarrassed, and finally, shortly prior to March 5, 1900, he became and continued wholly insolvent. On May 16, 1900, the defendant, acting under the advice of counsel, and with the consent of Moore, took possession under the mortgage of April 15, 1891, of all the livery property then on hand, and on June 11, 1900, caused the same to be sold at public auction by the sheriff. It is for the net avails of this sale, amounting to $922.08, which the sheriff paid over to the defendant, that this suit is brought. The Passumpsic Savings Bank on September 15, 1900, proved its note of $2,510.75 as an unsecured claim against the bankrupt estate of Moore, as the mortgage held by the bank as security had been given by Moore in March, 1900, to defendant, and by him assigned to the bank, within four months of the filing of the petition in bankruptcy.

For the purpose of defeating the effect of the defendant taking possession of the livery property under his chattel mortgage of April, 1891, the trustee in bankruptcy presented a petition to the United States District Court of Vermont for

leave to intervene as plaintiff in the Ryan attachment suit, and to have the lien of Ryan's attachment preserved for the benefit of the general creditors. This petition was dismissed by that court. The referee found that the defendant and his counsel knew when he took possession of the livery property, under his mortgage, that Moore was insolvent and was considering going into bankruptcy. The referee also found that he did not intend to perpetrate any actual fraud on the other creditors, or any of them, but he did intend thereby to perfect his lien on the livery property and make it available for the payment of his debt before other complications, by way of attachment or bankruptcy arose, and he understood at that time that it was probable that the Ryan attachment would hold good as against his mortgage. All the property of which defendant took possession was acquired by Moore with the full understanding and intent that it should be covered by the defendant's mortgage of April 15, 1891.

*Mr. Edward H. Deavitt* for plaintiff in error.

*Mr. Charles A. Prouty, Mr. Harry Blodgett* and *Mr. Jonathan Ross* for defendant in error.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

This is a contest between a trustee in bankruptcy representing the creditors of the bankrupt, and the defendant, the mortgagee in a chattel mortgage dated and executed April 15, 1891, and duly recorded April 18 of that year. The defendant has paid some $500 of the indebtedness of the bankrupt for which defendant was liable as endorser on a note, and he remains liable to pay the note of $2,510.75, held by the Passumpsic Savings Bank, which was signed by him as surety.

The property taken possession of by the defendant under the chattel mortgage was sold by a deputy sheriff on the

eleventh of June, 1900, and the net avails of the sale, amounting to $922.08, have been paid over by the officer who made the sale, to the defendant.

This suit is brought by the trustee to recover from the defendant those net avails on the theory that the action of the defendant in taking possession and making the sale of the property was unlawful under the provisions of the bankrupt act.

The defendant had assisted the bankrupt in the purchase of the property and had endorsed notes for him in order to enable him to carry on the business of conducting a livery stable. This mortgage, to secure him for these payments and liabilities, was given some seven years before the passage of the bankrupt act, and at the time it was given it was agreed by the parties to it that the bankrupt might sell or exchange any of the livery stock covered by it as he might desire, and should by purchase or exchange keep the stock good, so that the defendant's security should not be impaired, and it was also agreed that all after-acquired livery property should be covered by the mortgage as security for the debts specified therein.

Under this agreement the bankrupt made sales, purchases and exchanges of livery stock to such an extent that on May 16, 1900, there remained but two horses of the property originally on hand. The stock as it existed on the above date was all acquired by exchange of the original stock, or with the avails of the old stock sold, or the money derived from the business. There is no pretense of any actual fraud being committed or contemplated by either party to the mortgage. Instead of taking possession at the time of the execution of the mortgage, the defendant had it recorded in the proper clerk's office, and the record stood as notice to all the world of the existence of the lien as it stood when the mortgage was executed, and that the defendant would have the right to take possession of property subsequently acquired as provided for in the mortgage. The bankrupt was, therefore, not holding himself out

as unconditional owner of the property, and there was no se-
curing of credit by reason of his apparent unconditional .owner-
ship. The record gave notice that he was not such uncondi-
tional owner. There was no secret lien, and if defendant
cannot secure the benefit of this mortgage, which he obtained
in 1891, as a lien upon the after-acquired property, yet prior
to the title of the trustee for the benefit of creditors, it must
be because of some provision of the bankruptcy law, which
we think the court ought not to construe or endeavor to en-
force beyond its fair meaning.

In Vermont it is held that a mortgage, such as the one in
question, is good. The Supreme Court of that State has so
held in this case, and the authorities to that effect are also
cited in the opinion of that court. And it is also there held
that when the mortgagee takes possession of after-acquired
property, as provided for in this mortgage, the lien is good
and valid as against every one but attaching or judgment
creditors prior to the taking of such possession.

At the time when the defendant took possession of this
after-acquired property, covered by the mortgage, there had
been a breach of the condition specified therein, and the title
to the property was thereby vested in the mortgagee, subject
to the mortgagor's right in equity to redeem. This has been
held to be the law in Vermont (aside from any question as to
the effect of the bankrupt law), both in this case and in the
cases also cited in the opinion of the Supreme Court of Ver-
mont. The taking of possession of the after-acquired prop-
erty, under a mortgage such as this, is held good, and to relate
back to the date of the mortgage, even as against an assignee
in insolvency. *Peabody* v. *Landon*, 61 Vermont, 318, and
other cases cited in the opinion of the Supreme Court.

Whether and to what extent a mortgage of this kind is
valid, is a local question, and the decisions of the state court
will be followed by this court in such case. *Dooley* v. *Pease*,
180 U. S. 126.

The question that remains is, whether the taking of posses-

sion after condition broken, of these mortgaged chattels before, and within four months of filing the petition in bankruptcy, was a violation of any of the provisions of the bankrupt act?

The trustee insists that such taking possession of the after-acquired property, under the mortgage of 1891, constituted a preference under that act. He contends that the defendant did not have a valid lien against creditors, under that act; that his lien might under other circumstances have been consummated by the taking of possession, but as that was done within four months of the filing of the petition in bankruptcy, the lien was not valid.

Did this taking of possession constitute a preference within the meaning of the act?

It was found by the referee that when the defendant took possession of the property he knew that the mortgagor was insolvent and was considering going into bankruptcy, but that he did not intend to perpetrate any actual fraud on the other creditors, or any of them, but did intend thereby to perfect his lien on the property, and make it available for the payment of his debts before other complications, by way of attachment or bankruptcy arose. He then understood that Ryan's attachment would probably hold good against his mortgage. The question whether any conveyance, etc., was in fact made with intent to defraud creditors, when passed upon in the state court, is not one of a Federal nature. *McKenna* v. *Simpson*, 129 U. S. 506; *Cramer* v. *Wilson*, 195 U. S. 408. It can scarcely be said that the enforcement of a lien by the taking possession, with the consent of the mortgagor, of after-acquired property covered by a valid mortgage is a conveyance or transfer within the bankrupt act. There is no finding that in parting with the possession of the property the mortgagor had any purpose of hindering, delaying or defrauding his creditors, or any of them. Without a finding to the effect that there was an intent to defraud, there was no invalid transfer of the property within the provisions of sec-

tion 67e of the bankruptcy law. *Sabin* v. *Camp*, 98 Fed. Rep. 974.

In the case last cited the court, upon the subject of a preference, held that though the transaction was consummated within the four months, yet it originated in October, 1897, and there was no preference under the facts of that case. "What was done was in pursuance of the preëxisting contract, to which no objection is made. Camp furnished the money out of which the property, which is the subject of the sale to him, was created. He had good right, in equity and in law, to make provision for the security of the money so advanced, and the property purchased by his money is a legitimate security, and one frequently employed. There is always a strong equity in favor of a lien by one who advances money upon the property which is the product of the money so advanced. This was what the parties intended at the time, and to this, as already stated, there is, and can be, no objection in law or in morals. And when, at a later date, but still prior to the filing of the petition in bankruptcy, Camp exercised his rights under this valid and equitable arrangement to possess himself of the property and make sale of it in pursuance of his contract, he was not guilty of securing a preference under the bankruptcy law."

The principle that the taking possession may sometimes be held to relate back to the time when the right so to do was created, is recognized in the above case. So in this case, although there was no actual existing lien upon this after-acquired property until the taking of possession, yet there was a positive agreement, as contained in the mortgage and existing of record, under which the inchoate lien might be asserted and enforced, and when enforced by the taking of possession, that possession under the facts of this case, related back to the time of the execution of the mortgage of April, 1891, as it was only by virtue of that mortgage that possession could be taken. The Supreme Court of Vermont has held that such a mortgage gives an existing lien by contract, which may

be enforced by the actual taking of possession, and such lien can only be avoided by an execution or attachment creditor, whose lien actually attaches before the taking of possession by the mortgagee. Although this after-acquired property was subject to the lien of an attaching or an execution creditor, if perfected before the mortgagee took possession under his mortgage, yet if there were no such creditor, the enforcement of the lien by taking possession would be legal, even if within the four months provided in the act. There is a distinction between the bald creation of a lien within the four months, and the enforcement of one provided for in a mortgage executed years before the passage of the act, by virtue of which mortgage and because of the condition broken, the title to the property becomes vested in the mortgagee, and the subsequent taking possession becomes valid, except as above stated. A trustee in bankruptcy does not in such circumstances occupy the same position as a creditor levying under an execution, or by attachment, and his rights, in this exceptional case, and for the reasons just indicated, are somewhat different from what they are generally stated. *Mueller* v. *Nugent*, 184 U. S. 1.

It is admitted on the part of the counsel for the plaintiff in error that the rule in Vermont, in cases of chattel mortgages of after-acquired property (where possession by the mortgagee is necessary to perfect his title as against attaching or execution creditors), is that although such possession be not taken until long after the execution of the mortgage, yet the possession, when taken (if it be before the lien of the attaching or execution creditor), brings the property under the cover and operation of the mortgage as of its date—the time when the right of possession was first acquired. It was also admitted that the Supreme Court of Vermont has held that when a chattel mortgage requiring possession of the mortgaged property, to perfect it as to third persons, was executed more than four months before the commencement of insolvency proceedings, the taking of actual possession of the mortgaged property within the four months' period brought that prop-

erty under the mortgage as of its date, and so did not constitute a preference voidable by the trustee, although the other elements constituting a preference were present. Many decisions of the Supreme Court of Vermont are cited to this effect. It will be observed, also, that the provisions of the state insolvency law in regard to void and voidable preferences and transfers were identical with similar provisions of the bankruptcy act of 1867. *Gilbert* v. *Vail*, 60 Vermont, 261.

Under that law it was held that the assignee in bankruptcy stood in the shoes of the bankrupt, and that "except where, within a prescribed period before the commencement of proceedings in bankruptcy, an attachment has been sued out against the property of the bankrupt, or where his disposition of his property was, under the statute, fraudulent and void, his assignees take his real and personal estate, subject to all equities, liens and encumbrances thereon, whether created by his act or by operation of law." *Yeatman* v. *Savings Institution*, 95 U. S. 764. See also *Stewart* v. *Platt*, 101 U. S. 731; *Hauselt* v. *Harrison*, 105 U. S. 401. Under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or encumbrance of the property which is void as against the trustee by some positive provision of the act. *In re Garcewich*, 115 Fed. Rep. 87, 89, and cases cited.

It is true that in the case in 95 U. S. 764, the savings institution had a special property in the certificates which were the subject of dispute, and had possession of them at the time of the bankruptcy proceedings, and it was held that the institution was not bound to return them, either to the bankrupt, the receiver or the assignee in bankruptcy, prior to the time of the payment of the debt for which the certificate was held. So the state court held in this case, where the defendant took possession under the circumstances detailed, by virtue of his mort-

gage, and where he had the legal title to the property mortgaged, after condition broken, that the possession thus taken related back to the date of the giving of the mortgage, and in thus enforcing his lien there was not a violation of any of the provisions of the bankruptcy act.

In *Wilson* v. *Nelson*, 183 U. S. 191, it was held that the bankrupt had committed an act of bankruptcy, within the meaning of the bankrupt law, by failing, for at least five days before a sale on the execution issued upon the judgment recovered, to vacate or discharge the judgment, or to file a voluntary petition in bankruptcy. The judgment and execution were held to have been such a preference, "suffered or permitted" by the bankrupt, as to amount to a violation of the bankrupt act. Although the judgment was entered upon the power of attorney given years before the passage of the bankrupt act, it was nevertheless regarded as "suffering or permitting" a preference, within that act. This is not such a case. As we have said, there is no finding that the defendant had reasonable cause to believe that by the change of possession it was intended to give a preference. As the state court has said, it was rather a recognition of what was regarded as a right under the previous agreement contained in the mortgage.

Nor does the existence of the Ryan attachment, or the chattel mortgage of March 5, 1900, executed by the bankrupt and delivered to the defendant and by him assigned on the twenty-third of March, 1900, to the bank, create any greater right or title in the trustee than he otherwise would have. The trustee moved under section 67*f*, on notice to the defendant, for an order that the right or lien under the Ryan attachment should be preserved, so that the same might pass to the trustee for the benefit of the estate, as provided for in that section. This was denied. And unless such permission had been granted, the lien of the attachment was not preserved by the act, but, on the contrary, it was dissolved under section 67*c*.

The mortgage assigned to the bank, and the attachment

obtained by Ryan having been dissolved by the bankrupt proceedings, the defendant's rights under his mortgage of April 15, 1891, stood the same as though there had been no subsequent mortgage given, or attachment levied. This is the view taken by the state court of the effect of the dissolution of the mortgage and attachment liens under the bankrupt act, and we think it is the correct one. It is stated in the opinion of the state court as follows:

"It is urged that with the annulment of the attachment, the property affected by it passed to the trustee as a part of the estate of the bankrupt under the express provisions of section 67*f*. There would be more force in this contention were it not for the provision that, by order of the court, an attachment lien may be preserved for the benefit of the estate. If there is no other lien on the property, there can be no occasion for such order; for on the dissolution of the attachment, the property, unless exempt, would pass to the trustee anyway. It is only when the property for some reason may not otherwise pass to the trustee as a part of the estate that such order is necessary. We think such is the purpose of that provision, and that unless the lien is preserved, the property, as in the case at bar, may be held upon some other lien and not pass to the trustee. *In re Sentenne & Green Co.*, 120 Fed. Rep. 436."

We think the judgment of the Supreme Court of Vermont was right, and it is

*Affirmed.*